76 F.3d 381
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Ronald DEL RAINE, Plaintiff-Appellant,
v.
Dr. C.D. JUMAO-AS, Cecil A. Turner and Dr. Kenneth P.
Moritsugu, Defendants-Appellees.
 No. 94-3514.
 United States Court of Appeals, Seventh Circuit.
 Submitted Aug. 22, 1995.*
Decided Feb. 1, 1996.
 
 Before CUMMINGS, COFFEY and ILANA DIAMOND ROVNER, Circuit Judges.
 
 ORDER
 
 1
 Ronald Del Raine, a former prisoner at the United States Penitentiary in Marion, Illinois, ("Marion") who now is incarcerated at the United States Penitentiary in Leavenworth, Kansas, filed a suit pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), in which he sought a declaratory judgment, damages and injunctive relief.[1] He claimed that Warden Cecil Turner, Dr. C.D. Jumao-as, the prison physician, and Dr. Kenneth Moritsugu, Director of Health Services for the Bureau of Prisons in Washington, D.C., denied him treatment for his ulcerative colitis in violation of the Eighth Amendment. The district court granted summary judgment to all three defendants. On appeal, Del Raine contends that although he received medical attention, he did not receive treatment from Dr. Jumao-as. Furthermore, he argues that even if the doctor's care appears merely negligent, the duration of the negligence created a genuine issue of material fact as to the doctor's deliberate indifference. Del Raine also claims that the record reveals genuine issues of material fact as to the deliberate indifference and personal involvement of Warden Turner and Dr. Moritsugu.[2] We affirm.
 
 
 2
 We review the district court's grant of summary judgment de novo in general and construe the record and all reasonable inferences drawn from it in favor of the nonmoving party in order to determine whether any genuine issue of material fact exists and whether the moving party deserves judgment as a matter of law. CSX Transp., Inc. v. Chicago & North Western Transp. Co., 62 F.3d 185, 188 (7th Cir.1995) (citations omitted). If the nonmoving party bears the burden of establishing the existence of an element at trial, but fails to supply sufficient evidence to establish the existence of that element, summary judgment must be granted in favor of the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 324-5 (1986).
 
 
 3
 In order to prove that a prison official has violated a prisoner's Eighth Amendment rights by denying treatment, the prisoner must prove that the official acted with deliberate indifference to a serious medical need. Estelle v. Gamble, 429 U.S. 97, 104-05 & n. 10 (1976); see Farmer v. Brennan, 114 S.Ct. 1970, 1977 (1994). This test has objective and subjective elements. The objective component concerns whether the alleged acts or practices constitute "the unnecessary and wanton infliction of pain contrary to contemporary standards of decency." Helling v. McKinney, 113 S.Ct. 2475, 2480 (1993); Del Raine v. Williford, 32 F.3d 1024, 1037 (7th Cir.1994). The subjective element of "deliberate indifference" requires that the defendant knew of and consciously disregarded a risk of serious harm. Del Raine, 32 F.3d at 1032.
 
 
 4
 Construing the record in the light most favorable to Del Raine, there is a genuine question of material fact as to whether he suffered from ulcerative colitis intermittently in 1992. The medical record mentions a history of colitis, and he describes symptoms of the disease, such as cramps and bloody, frothy diarrhea. Moreover, we cannot say as a matter of law that such colitis did not constitute a serious medical condition. Ulcerative colitis is a
 
 
 5
 chronic, recurrent ulceration in the colon, chiefly of the mucosa and submucosa, of unknown cause; it is manifested clinically by cramping, abdominal pain, rectal bleeding, and loose discharges of blood, pus, and mucus with scanty fecal particles. Complications include hemorrhoids, abscesses, fistulas, perforation of the colon, pseudopolyps, and carcinoma.
 
 
 6
 Dorland's Illustrated Medical Dictionary 356 (27th ed. 1988). Del Raine alleges intermittent profuse intestinal bleeding over the course of a year. Once, prior becoming Dr. Jumao-as' patient, he had fainted and received a blood transfusion because chronic intestinal bleeding had left him severely anemic. Del Raine mentions instances of cramps and of soiling himself. He also states that a prior physician told him that ulcerative colitis exposed him to a substantially increased risk of cancer. See Helling, 113 S.Ct. at 2481-82.
 
 
 7
 Nonetheless, Dr. Jumao-as and the other defendants may be entitled to summary judgment if the record fails to show either that they were personally involved in the constitutional deprivation or that they acted with deliberate indifference. "[A] prison official cannot be found liable under the Eighth Amendment ... unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serous harm exists, and he must also draw the inference." Farmer, 114 S.Ct. at 1979 (emphasis added).
 
 
 8
 A. Summary Judgment in Favor of Dr. Jumao-as.
 
 
 9
 In his complaint, Del Raine alleges a series of failures to diagnose and treat flare-ups of his colitis by Dr. Jumao-as from January 7 to December 31, 1992. Throughout this period and afterward, Del Raine frequently saw Dr. Jumao-as or his assistants for a variety of ailments, including pneumonia and rhinitis, for which he received medications. He was also admitted to the U.S. Medical Center for Federal Prisoners in Springfield, Missouri, to have an operation for an inguinal hernia on October 30, 1992, and he was discharged from that hospital on December 10, 1992. Although the defendants emphasize the overall amount of medical attention that Del Raine received, which appears to be substantial, we will focus on whether Dr. Jumao-as demonstrated deliberate indifference to his patient's colitis.
 
 
 10
 The factual summaries in this order derive from Del Raine's medical records and the affidavits of Dr. Jumao-as and Del Raine, which are construed in Del Raine's favor. Prior to January 7, 1992, Del Raine had suffered from colitis intermittently for many years, and he had received medication for the condition. By July 9, 1991, Dr. Jumao-as was participating in Del Raine's medical care. Del Raine complained to Dr. Jumao-as of rectal bleeding on December 20, 1991. The results of a rectal examination and blood tests were normal.
 
 
 11
 Del Raine states that from January through June 1992, he suffered various symptoms of colitis. He saw the prison physician on February 7, 1992, and a rectal probe revealed no bleeding. Medical records from that date indicate that Dr. Jumao requested "stool for occult blood x3." (R. 22 (Chronology of Medical Care).) Thereafter, a physician's assistant made entries in Del Raine's chart on February 10, 11, and 12, 1992, stating "[s]tool specimen obtained for guiac [sic],"[3] and indicating a positive result. (Id.) On February 18, 1992, Del Raine saw Dr. Jumao-as about his pneumonia. The doctor declined to give him steroids because they would interfere with the medication for his pneumonia. According to Del Raine, the steroids were for treating his colitis. On March 10, 1992, during another examination, Del Raine again complained of bleeding, but the blood test and rectal examination were negative. Dr. Jumao-as refused his patient's offer to provide him with a bloody stool sample. On May 21, 1992, after Del Raine informed his doctor that he was bleeding, the physician performed another rectal exam, which showed nothing, and performed another blood test. The blood count was normal. The prisoner met with Dr. Jumao again on June 25, 1992, for an evaluation of some test results. When he informed the doctor of his symptoms, Dr. Jumao-as said that Del Raine did not have ulcerative colitis and that " '[h]e doesn't know what he's talking about....' " (R. 19 at 6.) The doctor found that Del Raine's blood count was normal, except that his hemoglobin was slightly below the normal range, but not alarmingly so. A radiologist was present to perform a barium enema, but since Del Raine had not been told not to eat in advance, he could not take this diagnostic test. Del Raine submitted six written complaints to Dr. Jumao-as concerning his colitis on January 29, February 4, February 5, March 4, March 8 and April 4 of 1992.
 
 
 12
 According to the complaint, Del Raine's colitis went into remission in July 1992. Once in July, he refused to sign a consent proffered by a physician's assistant for a barium enema because the assistant incorrectly described it as a treatment, rather than a diagnostic test. On August 14, 1992, Dr. Jumao-as met with Del Raine, who, according to the prisoner's affidavit, refused a barium enema because it was not treatment. Del Raine's complaint indicates that he refused it because his colitis was in remission. Del Raine does not point to any further attacks of colitis until December 12, 1992, although the medical records from the U.S. Medical Center at Springfield indicate that he listed colitis as one of his medical problems. An entry in his U.S. Medical Center chart on November 11 indicates that he was referred to the medical clinic in reference to his colitis. A transfer summary prepared by a physician's assistant on December 3, 1992 states: "Patient was also referred to our Medical Clinic regarding his history of ulcerative colitis. Patient has had no symptoms for some time now; however, it was recommended by Dr. Nelson to consider Azulfidine therapy if symptoms return." (R. 22 (U.S. Medical Center at Springfield Transfer Summary).)
 
 
 13
 On December 12, while still at the U.S. Medical Center, Del Raine's colitis recurred. Two days later, he showed a guard and a nurse blood in his toilet. Over the following week, while he was transferred to federal penitentiaries in El Reno, Oklahoma and Terre Haute, Indiana, he suffered further attacks. He returned to Marion on December 21, 1992 after leaving a "Hemoccult" test[4] at Terre Haute. He informed Dr. Jumao-as in writing that he suffered from bleeding again and that he had left behind a blood sample. On December 31, Dr. Jumao-as performed another rectal examination, which was negative. The results of a blood test from December 29, 1992 had not significantly changed from one measured on February 7, 1992; it did not show excessive blood that would indicate sulfa or steroid medication. The progress notes indicate that the chronic ulcerative colitis was not active.
 
 
 14
 The record also contains evidence of events subsequent to those alleged in Del Raine's complaint. Dr. Jumao-as met with his patient on February 18, 1993, but Del Raine refused a rectal examination. Del Raine informed the doctor that Del Raine's blood test at Terre Haute had been positive, to which Dr. Jumao-as responded "Hemoccult is only for detecting small amounts of blood!" (R. 19 (Aff. of Feb. 27, 1993).) On May 18, 1993, the results of a follow-up blood test were normal. Dr. Jumao-as conducted another follow-up examination for colitis on May 24, 1993, during which Del Raine had no complaints. Del Raine says that he was bleeding again on June 13, 14, and 23. A blood test on June 15, 1993 was normal. On June 25, 1993 he showed a physician's assistant blood in his toilet. He also submitted a written complaint to Dr. Jumao-as on that day. On June 30, 1993, blood tests revealed mild anemia, and on July 12, 1993, in response to the prisoner's complaint's of non-bloody diarrhea and further evidence of mild anemia, the doctor prescribed Cortenema. According to Del Raine, after finishing two packages of Cortenema, his ulcerative colitis cleared up.
 
 
 15
 Del Raine claims that Dr. Jumao-as violated his Eighth Amendment rights by failing to provide him with treatment instead of mere diagnostic tests. However, a physician does not violate the Eighth Amendment by denying treatment after a reaching a negative diagnosis, unless he acted with deliberate indifference in examining the patient. See Farmer, 114 S.Ct. at 1982 n. 8; Estelle, 429 U.S. at 106. Furthermore, a medical decision concerning whether or not to order an additional diagnostic test or form of treatment, which is a "classic example of a matter for medical judgment," does not by itself constitute cruel and unusual punishment, even if it is negligent. Estelle, 429 U.S. at 107. Even if Dr. Jumao-as repeatedly negligently misdiagnosed Del Raine as not suffering from active colitis, such malpractice would not constitute a constitutional violation. Although a string of negligent acts, regardless of how lengthy, cannot by itself amount to a violation of the Eighth Amendment, it may provide "evidence of the magnitude of the risk created by the defendants' conduct and the knowledge of the risk by the defendant." Sellers v. Henman, 41 F.3d 1100, 1103 (7th Cir.1994). "The more negligent acts they commit in a circumscribed interval, the likelier it is that they know they are creating some risk...." Id. However, the overall series of negative test results in this case, even if negligently chosen or administered, does not create a pattern that would indicate knowledge of a need for treatment.
 
 
 16
 We find the propriety of granting summary judgment a close call in this case because not all of the tests performed yielded negative results. Laboratory tests for fecal blood on February 10-12, 1992, yielded positive results, and a week later, Dr. Jumao-as allegedly refused to prescribe steroids because it would interfere with his antibiotic treatment for pneumonia. Del Raine interpreted this statement to imply that the doctor would have provided treatment for his colitis if he had not had pneumonia. Even construed in the light most favorable to Del Raine, the events of February and March indicate positive test results, a valid reason not to prescribe treatment, and then negative test results followed by no treatment. This pattern does not evince deliberate indifference. Although we find the doctor's refusals to accept offers of bloody stool samples quite troubling, see Farmer, 114 S.Ct. at 1982 n. 8 (noting that prison official may not escape liability of obvious risk by refusing to verify strong suspicion of its existence), Dr. Jumao-as used other means, such as blood tests and digital examinations, to verify the existence of flare-ups and found nothing. He also personally attempted to use a barium enema test on at least two occasions, but was unable to do so for various reasons. Later, in 1993, when positive evidence was produced, Del Raine eventually received treatment, which was successful. There is no evidence that the doctor purposely blinded himself to the attacks of colitis.
 
 
 17
 B. Summary Judgment in Favor of Warden Turner.
 
 
 18
 Del Raine's affidavit notes a number of instances in which he informed Warden Turner about his need for treatment. During 1992, Del Raine submitted an informal complaint on April 7, complained to Warden Turner personally on March 11 and August 19 (the latter generally about Dr. Jumao-as, rather than about his colitis), and filed three formal administrative complaints relating to his colitis on March 11, April 9, and December 31. In memoranda addressing the first two formal complaints, the warden noted recent examinations with negative findings and Del Raine's medical history, which included prostatic hypertrophy and "[i]nternal bleeding hemorrhoids due to excessive straining to urinate." (R. 19.) In the warden's response to the third formal complaint, he noted that neither the hospital at Springfield, nor Dr. Jumao-as after the December 31 examination had found the need to prescribe medication for colitis. In all three cases, he stated that the record had been reviewed and that the staff had been consulted. In each, he found that the medical staff was providing proper evaluations, care and treatment. Del Raine's sister also wrote Warden Turner a letter dated May 2, 1992, expressing her concerns about the prison doctor's failure to diagnose her brother's condition. On May 13, 1992, the warden responded to her letter. He described some of the care given to Del Raine, who was seen on a regular basis, and he assured her that her brother was being taken care of appropriately. After December 31, 1992, Del Raine also submitted other formal and informal complaints to the warden.
 
 
 19
 With respect to Warden Turner, the record indicates that Del Raine notified him of his condition and his need for treatment. However, the evidence does not demonstrate that Warden Turner drew the inference that harm would result if he did not act. On the contrary, after reviewing Del Raine's medical history (including the opinions of physicians at other facilities), he found that the prisoner was receiving adequate medical attention. At best, the record shows that he "knew the underlying facts but believed ... that the risk to which the facts gave rise was insubstantial or nonexistent." Farmer, 114 S.Ct. at 1982. Therefore, the district court properly granted summary judgment to Warden Turner.
 
 
 20
 C. Summary Judgment in Favor of Dr. Moritsugu.
 
 
 21
 The district court found that Del Raine failed to prove Dr. Moritsugu's direct participation or personal involvement in the alleged deprivation. A Bivens action will not lie on the basis of respondeat superior or supervisory liability. Del Raine, 32 F.3d at 1047. In a letter to Dr. Moritsugu dated April 30, 1992, Del Raine complained about his treatment. The letter states that he enclosed some administrative complaints. Del Raine's unsigned copy of the letter from Del Raine's sister to Warden Turner on May 2, 1992, also indicates that a copy was circulated to Dr. Moritsugu. Del Raine later wrote others letters to Dr. Moritsugu dated January 18, 1993, and February 21, 1993. He also sent a letter to the Surgeon General on July 11, 1993, which was eventually forwarded to Dr. Moritsugu. The record contains no evidence of any response to these letters.
 
 
 22
 Sending five letters, including three sent after the events alleged in Del Raine's complaint, is not sufficient to establish Dr. Moritsugu's liability. Del Raine bears the burden of proving personal involvement at trial. To avoid summary judgment, there must be sufficient evidence to establish (1) that Dr. Moritsugu was directly personally involved in the deprivation, (2) that the deprivation occurred at Dr. Moritsugu's personal direction or with his knowledge and consent, or (3) that Dr. Moritsugu acted or failed to act with deliberate or reckless disregard of his constitutional rights. Crowder v. Lash, 687 F.2d 996, 1005-06 (7th Cir.1982) (emphasis added). The record contains no evidence that Dr. Moritsugu actually participated in the prisoner's care and treatment, that he instructed others to deny treatment or that he personally consented to such a denial. Del Raine has not alleged or provided any evidence that any of the defendants put forth or followed any official policy to deny him treatment for his colitis.
 
 
 23
 Thus, the thrust of Del Raine's claim is that his letters to the Director of Health Services for the Bureau of Prisons, whose duties stretch across the entire nation, sufficed to render the Director personally liable for failing to intervene on his behalf with reckless disregard for his constitutional rights. (This theory assumes that Dr. Moritsugu himself read all of the mail addressed to him.) In Crowder, the plaintiff attempted to hold Indiana's Commissioner of Corrections personally liable on the basis of communications from both the prisoner, personally and by letter, and the Commissioner's subordinates. This court held that
 
 
 24
 [t]he logical import of this theory, however, would be to hold any well informed Commissioner of Corrections personally liable for damages flowing from any constitutional violation at any jail within that Commissioner's jurisdiction. We believe that such a broad theory of liability is inconsistent with the personal responsibility requirement for assessing damages against public officials in a section 1983 action.
 
 
 25
 Id. at 1006. In general, the individual participation requirement for Bivens actions parallels the requirement for § 1983. Del Raine, 32 F.3d at 1047. In light of Crowder, sending a few letters to the office of Dr. Moritsugu, who is officially responsible for the care of federal prisoners across the country, is not sufficient to demonstrate personal responsibility.[5]
 
 
 26
 AFFIRMED.
 
 
 
 *
 After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." See Fed.R.App.P. 34(a); Cir.R. 34(f). No such statement having been filed, the appeal is submitted on the briefs and record
 
 
 [1]
 The request for injunctive relief is moot since Del Raine is no longer at Marion and he has not alleged that he is likely to be returned there. Houston v. Sheahan, 62 F.3d 902, 903 (7th Cir.1995)
 
 
 [2]
 Del Raine claims for the first time on appeal that summary judgment should not have been granted until he had an opportunity to pursue discovery. However, he himself moved for partial summary judgment on the issue of liability before the court granted summary judgment to Dr. Jumao-as and Warden Turner, and he actually requested that the court issue a ruling with respect to Dr. Moritsugu
 
 
 [3]
 "Guaiac" is a resin "used as a reagent in tests for occult blood...." Dorland's Illustrated Medical Dictionary at 721
 
 
 [4]
 A "Hemoccult" test is a trade name for the guaiac test for occult (i.e. hidden) blood. Dorland's Illustrated Medical Dictionary at 746-47. In his complaint, he describes the sample as a "rectal blood sample." (R. 1 at 6.)
 
 
 [5]
 This case is distinguishable from cases such as Jamison-Bey v. Thieret, 867 F.2d 1046, 1047-48 & n. 1 (7th Cir.1989), in which this court reversed an award of summary judgment to the warden of a prison who "made routine tours of the segregation unit and personally heard prisoner grievances, during which time Jamison-Bey claims to have complained ... repeatedly." The warden in that case had a smaller area of responsibility (a single prison) with a closer relationship to the prisoner's living conditions, and he was informed of the violations on numerous occasions. See Radick v. Hardiman, 588 F.Supp. 932, 935-36 (N.D.Ill.1984)